# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JAIME SIMMONS,
        **Plaintiff,**

v.
                                 **Civil Action No. 2:04CV87**
                                 **(The Honorable Robert E. Maxwell)**

JO ANNE B. BARNHART,
Commissioner of Social Security,
        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on Plaintiff's letter motion for summary judgment [Docket Entry 9] and Defendant's Motion for Summary Judgment [Docket Entry 14] and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## I. Procedural History

Jaime Simmons ("Plaintiff") filed an application for SSI and DIB on October 26, 2002. Plaintiff alleged disability since August 1, 2000, due to carpal tunnel syndrome (R. 76-78, 98, 423-25). Plaintiff's applications were denied at the initial and reconsideration levels (R. 44, 45, 426, 432). Plaintiff requested a hearing, which Administrative Law Judge Barbara Gibbs ("ALJ") held on January 5, 2004, and at which Plaintiff, acting *pro se*, and Dr. Larry Ostrowski, Vocational Expert ("VE") testified (R. 56, 446-97). On February 4, 2004, the ALJ entered a decision finding

Plaintiff was not disabled as defined by the Act (R. 25-27). Subsequent to the ALJ's decision, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-9).

On November 17, 2004, *pro se* Plaintiff filed the instant case, *via* a letter complaint, in the United States District Court for the Northern District of West Virginia [Docket Entry 1]. On that same date, Plaintiff was provided a Notice of General Guidelines for Appearing *Pro Se* in Federal Court [Docket Entry 3]. On January 24, 2005, Defendant answered Plaintiff's letter complaint [Docket Entry 6]. On January 24, 2005, the District Judge ordered that the parties file their motions for summary judgment in accordance with LR Gen P 83.12 [Docket Entry 7].

On July 12, 2005, the District Judge issued an Order to Show Cause directing Plaintiff to file her motion for summary judgment and brief in support thereof on or before August 1, 2005 [Docket Entry 8]. On July 20, 2005, Plaintiff filed a letter response to the Court's order to show cause, stating therein the reasons she felt she could not perform work activities [Docket Entry 9]. On September 15, 2005, the District Judge ordered Plaintiff's letter in response to the Court's Order to Show Cause be construed as her Motion for Summary Judgment and ordered Defendant to file her Motion for Summary Judgment and brief in support thereof on or before October 14, 2005 [Docket Entry 13]. On October 13, 2005, Defendant filed her Motion for Summary Judgment and brief in support thereof [Docket Entry 14].

On October 19, 2005, the undersigned issued an order advising Plaintiff of her right to file with the Court, on or before November 18, 2005, any response she may have to Defendant's Motion for Summary Judgment [Docket Entry 16]. Plaintiff did not Respond. On November 3, 2005, the District Judge referred the Motions for Summary Judgment to the undersigned magistrate judge

for preparation and submission of findings of fact and recommended disposition [Docket Entry 17].

## II. Statement of Facts

Plaintiff was born on April 3, 1976, and was twenty-seven years old at the time of the ALJ's decision (R. 27, 76). Plaintiff earned a GED and previously worked as a customer service representative, secretary, hotel clerk, cashier/checker, and fast food worker (R. 19, 107, 455). At the time of the administrative hearing, Plaintiff lived with her two children, ages 1 ½ years old and 2 months old, as well as with her fifteen-year-old sister, of whom she had custody (R. 458).

On April 25, 2000, Nityananda Santra, M.D., performed a colonoscopy of Plaintiff. Dr. Santra opined the test revealed "no colitis of any kind, no mucosal abnormalities seen. No diverticula, no polyp, no growth identified," but noted the "findings could be consistent with spastic colitis or irritable bowel syndrome" (R. 179).

On August 1, 2000, Plaintiff was examined by Bret Rosenblum, M.D. Plaintiff stated her "arm [was] getting worse." She experienced sensations of "needles from wrist to shoulder," "burning," weakness, and numbness. Plaintiff asserted that wearing a brace helped. Dr. Rosenblum referred Plaintiff to Lucas J. Pavlovich, M.D., and scheduled an appointment with Dr. Pavlovich for August 15, 2000 (R. 153).

On August 15, 2000, Dr. Pavlovich examined Plaintiff for carpal tunnel syndrome. Plaintiff informed Dr. Pavlovich she worked at a telemarketing firm and had been wearing a wrist splint for the past two to three weeks. Plaintiff stated she had nocturnal symptoms and she felt "clumsiness while typing." Plaintiff asserted her pain was "localized to the volar[1] aspect of her forearm radiating

---

[1]Volar: pertaining to the palm. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 29th Ed., 2000, at 1977.

towards her elbow and shoulder" and "it frequently awaken[ed] her from her sleep." Dr. Pavlovich's examination revealed "no radicular symptoms associated with range of motions" of Plaintiff's cervical spine. No shoulder impingement was observed. Plaintiff had a "negative Tinel over her ulnar nerve bilaterally with a positive Tinel over her median nerve bilaterally," with her right being much greater than the left. Plaintiff had a "positive Phalen's bilaterally," with the right greater than the left. Plaintiff's grip was "5/5," she had no weakness of her "abductor pollicis brevis muscles," and her "Allen's test" was normal. X-rays of Plaintiff's wrist revealed "no evidence of radiopathology on AP and lateral views." Dr. Pavlovich diagnosed right upper extremity carpal tunnel syndrome, for which he prescribed a cock-up wrist splint and discussed treatment options (R. 286).

On September 7, 2000, Plaintiff reported to Dr. Pavlovich that her carpal tunnel syndrome symptoms had not changed (R. 285).

On September 15, 2000, Plaintiff reported to the Emergency Department of Davis Memorial Hospital with headache, neck pain, and back pain (R. 230). A CT scan was taken of Plaintiff's brain, and the test results were normal (R. 233).

On September 20, 2000, Plaintiff underwent nerve conduction studies, which were performed by Sally H. Swisher, M.D. Dr. Swisher observed Plaintiff's "[n]erve conduction study of the right upper extremity revealed a mildly prolonged distal latency in the right medial sensory and to a lesser extent on the left. Needle exam of both upper extremities did not reveal any evidence of denervation." Dr. Swisher opined Plaintiff's "[m]ildly abnormal EMG" revealed "prolongation in both median nerves on the sensory study of the wrist suggestive of bilateral carpal tunnel syndrome" (R. 288).

4

On September 28, 2000, Plaintiff presented to Dr. Pavlovich with "bilateral complaints" relative to carpal tunnel syndrome. Plaintiff asserted she frequently experienced clumsiness of her hands and frequently awoke from sleep due to pain. Plaintiff had a "positive Phalen's as well as positive Tinel's test bilaterally at both wrists and no weakness of the abductor pollicis brevis." No atrophy, no radicular symptoms, and no impingement in the shoulder were observed. Dr. Pavlovich diagnosed bilateral carpal tunnel syndrome. Dr. Pavlovich opined Plaintiff would not be able to return to work because of persistent pain and difficulty performing repetitive movements (R. 284).

On December 4, 2000, Dr. Pavlovich performed a right carpal tunnel release surgery on Plaintiff (R. 178).

On December 18, 2000, Plaintiff presented to Dr. Pavlovich for follow up to the carpal tunnel release surgery. Plaintiff informed the doctor that her "nocturnal symptoms ha[d] resolved." Dr. Pavlovich observed "no weakness of . . . abductor pollicis brevis." He noted Plaintiff's grip strength was "4/5," and her distal sensory exam was normal. He referred Plaintiff to post-surgery physical therapy. Plaintiff informed Dr. Pavlovich she wished to proceed with left carpal tunnel release surgery (R. 282).

On December 20, 27, and 29, 2000, Plaintiff received physical therapy at Elkins Physical Therapy Service (R. 258-59).

On December 30, 2000, Plaintiff reported to the Emergency Department of Davis Memorial Hospital with complaints of right arm pain, post carpal tunnel release surgery (R. 219). She was treated with Vibramycin and Vicoden by Dr. J. Harris (R. 221, 222, 225)

On January 2, 2001, Plaintiff received physical therapy from Elkins Physical Therapy Service (R. 258).

On January 10, 2001, Plaintiff returned to Dr. Pavlovich for follow-up examination of her right carpal tunnel release surgery. Plaintiff stated she experienced persistent pain, difficulty sleeping, burning in her hand and into her shoulder, and difficulty performing overhead activities and activities of daily living. Dr. Pavlovich observed no radicular symptoms associated with Plaintiff's cervical spine range of motion. Plaintiff had a positive impingement of her right shoulder. Plaintiff's deltoid, biceps, triceps, and interossei strengths were "5/5" and her grip strength was "4/5." Plaintiff had no weakness in her abductor pollicis brevis, but a positive Tinel's test, with radiation. Dr. Pavlovich recommended continuation of physical therapy and prescribed Naprosyn (R. 281).

On January 11, 12, 15, 19, and 24, 2001, Plaintiff received physical therapy from Elkins Physical Therapy Service (R. 256-58).

On January 24, 2001, Plaintiff reported to Dr. Pavlovich that the numbness, tingling, and nocturnal symptoms relative to her right carpal tunnel syndrome had completely resolved. Plaintiff stated she experienced pain in her shoulder and elbow. Dr. Pavlovich observed Plaintiff had pain, which radiated into her trapezius muscles on rotation of her head and extension of her neck. Positive impingement of her shoulder was evident. Plaintiff had "no tenderness over the AC joint" or cross arm maneuver pain. Plaintiff was negative for Tinel's and Phalen's testing. Her grip was "5/5." Dr. Pavlovich opined Plaintiff had developed tendinitis and injected Plaintiff with Cortisone at her "subacromial space." Dr. Pavlovich instructed Plaintiff to wear a tennis elbow strap (R. 280).

Plaintiff cancelled her physical therapy at Elkins Physical Therapy Service January 26, 29, 30, and 31, 2001 (R. 256). Plaintiff also cancelled her physical therapy on February 2 and 13, 2001, but she received physical therapy on February 1, 5, 7, 9, and 14, 2001 (R. 255-56).

On February 14, 2001, Plaintiff presented to Dr. Pavlovich with right shoulder pain. Dr.

Pavlovich found Plaintiff had "pain on rotation of her head to the right and extension of her neck" that did not radiate to her hand. Plaintiff had positive impingement of her right shoulder. Plaintiff's supraspinatus, infraspinatus, and subscapularis strengths were "5/5." Plaintiff had a negative Tinel's test at the ulnar nerve at her elbow and the median nerve at her wrist. Dr. Pavlovich diagnosed "compensatory pain" in her neck and shoulder and opined the pain would be resolved with further conservative treatment (R. 279).

On February 14, 2001, Edward J. Doyle, M.D., reviewed the medical records of Plaintiff and opined Plaintiff had "recovered entirely from her carpal tunnel surgery and the symptoms she describe[d] seem more related to a shoulder and elbow problem, therefore there appear[ed] to be 0% impairment," and she was "fit for full duty as of 2/11/01" (R. 155-57).

Plaintiff received physical therapy at Elkins Physical Therapy Service on February 16, 21, and 22, 2001, and March 1, 2001. Plaintiff did not attend scheduled physical therapy sessions on February 19, 23, or 26 (R. 254-55).

On March 4, 2001, an Independent Medical Evaluation was completed of Plaintiff by John Meyer, M.D., upon his review of Plaintiff's medical records and physical examination (R. 1490-50). Dr. Meyer observed "tenderness to palpation diffusely around the area of the lower trapezius into the shoulder" and full range of motion of the shoulder, elbow, and left arm. Tinel's test was positive at the carpal tunnel release surgical scar and Phalen's test was positive. Plaintiff's strength was "normal . . . throughout." Dr. Meyer's impression was for "bilateral carpal tunnel syndrome, status post carpal tunnel release on the right side" and "[e]arly signs and evidence of reflex sympathetic dystrophy (RSD) or a similar complex regional pain syndrome, subsequent to injury and surgery on the right arm." Dr. Meyer opined Plaintiff had not reached maximum medical improvement and

7

should be treated by a pain specialist (R. 151).

On March 8, 2001, Dr. Pavlovich examined Plaintiff and observed she experienced "pain on palpation of her cervical spine as well as on range of motion related to the posterior aspect" and had "mildly positive impingement in her shoulder" (R. 278).

On April 18, 2001, Plaintiff was treated at the Center for Pain Relief for right shoulder pain (R. 158). Mario Serafini, D.O., opined Plaintiff experienced discomfort in her cervical spine, bilateral shoulders, and bilateral upper extremities (R. 166). The impression was for upper extension discomfort, neck strain, paravertebral muscle mass spasm, and somatic pain in shoulder. It was noted on the report that it was "unlikely" Plaintiff had RSD (R. 165-66). Dr. Serafini recommended Plaintiff follow up with Dr. Pavlovich (R. 166).

On April 24, 2001, Plaintiff presented to Dr. Pavlovich for follow-up to her bilateral carpal tunnel syndrome, right carpal tunnel release, and subsequent shoulder and neck pain. Dr. Pavlovich observed Plaintiff had no radicular symptoms associated with her cervical spine range of motion but did have positive impingement of both shoulders. Plaintiff's supraspinatus, infraspinatus, and subscapularis testings were "5/5." Dr. Pavlovich recommended continued physical therapy. Plaintiff declined a Cortisone injection (R. 277).

On May 16, 2001, Plaintiff returned to Dr. Pavlovich with continued right upper extremity and neck pain. She reported the pain had "improved somewhat over the past month." Dr. Pavlovich opined Plaintiff had no radicular symptoms associated with range of motion of the cervical spine, had negative impingement, and had mild pain on passive range of motion of her shoulder. He recommended Plaintiff continue physical therapy and prescribed OxyContin (R. 276).

On May 22, 2001, Dr. Pavlovich corresponded with Plaintiff's case manager at Workers'

Compensation. He summarized Plaintiff's condition and his treatment thereof (R. 167). Dr. Pavlovich opined that Plaintiff would be able to return to work in the "next several weeks" as she had realized "significant improvement over the past month" (R. 168).

Plaintiff reported to physical therapy at Elkins Physical Therapy Service on May 30 and 31, 2001, and June 1, 4, 6, 8, 12, 13, and 19, 2001 (R. 251-52). Plaintiff did not attend scheduled physical therapy on June 11, 15, and 18, 2001 (R. 251).

On June 19, 2001, Plaintiff returned to Dr. Pavlovich and reported her shoulder and neck pain had "greatly improved." Plaintiff had no radicular symptoms with range of motion of the cervical spine or significant pain with passive range of motion of her shoulder. A Tinel's test was negative and her grip strength was "5/5." Dr. Pavlovich recommended Plaintiff obtain an IME because she felt she could not return to work at that time (R. 275).

Plaintiff received physical therapy at Elkins Physical Therapy Service on June 20, 2001; July 16, 18, 20, 23, 25, 27, and 30, 2001; and August 6, 2001 (R. 248-49, 251). Plaintiff did not attend scheduled physical therapy sessions on August 1, 8, 9, 10, and 13, 2001 (R. 248).

On August 13, 2001, F. Clifford Valentin, M.D., evaluated Plaintiff on referral from Dr. Serafini for arm paresthesias. Plaintiff reported to Dr. Valentin she experienced "numbness and burning-type symptoms starting in her wrists and radiating proximally to her shoulders . . . ." Plaintiff stated she had mild paresthesias in her hands and fingers, no neck pain, and no pain radiating down her arms. Plaintiff informed Dr. Valentin she was medicating with Ultram, Naprosyn, and Tylenol (R. 169). Dr. Valentin's physical examination of Plaintiff revealed Plaintiff's upper extremity reflexes were "+2 bilateral"; muscle strength was "4+/5" bilaterally; her sensation was diminished in "median distribution distal to the wrist in the right hand to pinprick";

9

Spurling's test was negative; Phalen's test was positive at the wrist bilaterally; Plaintiff's rotator cuff examination was negative; she had full range of motion of her shoulders; and there was "[n]o resistive pain to shoulder abduction, external or internal rotation." Dr. Valentin's assessment was for the following: 1) "[b]ilateral forearm paresthesias from wrist to shoulders, right side greater than left"; 2) right carpal tunnel release; and 3) work related injury. Dr. Valentin noted he "saw no evidence of RSD." He opined Plaintiff's function was limited "mainly due to pain" and she had normal activities of daily living. He observed "[n]o pronounced sensory motor deficits which would create in significant [sic] functional deficits." Dr. Valentin recommended Plaintiff undergo an EMG (R. 170).

On August 29, 2001, Plaintiff reported to Dr. Pavlovich that her neck pain had improved, but she still experienced pain "in the superior aspect of her shoulder" and had a recurrence of tingling in her fingers. Dr. Pavlovich observed Plaintiff had mild shoulder impingement, "negative Tinel's test over her ulnar nerve at her elbow and median nerve at her wrist," negative Phalen's test, "5/5" grip strength, and no atrophy of her thenar[2] or hypothenar eminence[3]. Dr. Pavlovich recommended continuation of "rehab" (R. 274).

On September 11, 2001, David Lynch, M.D., completed an Independent Medical Examination of Plaintiff. Plaintiff informed Dr. Lynch she "had no help with her right arm symptoms" after the carpal tunnel release surgery. Plaintiff stated she continued to experience daily pain in her right arm and tingling, burning, and numbness in her hand and that she experienced

---

[2]Thenar: the mound on the palm of the base of the thumb. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 29th Ed., 2000, at 1823.

[3]Hypothenar eminence: the fleshy eminence on the palm along the ulnar margin. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 29th Ed., 2000, at 867.

similar symptoms in her left arm. Plaintiff informed Dr. Lynch she "noticed recent neck pain." Plaintiff stated she did not improve with physical therapy (R. 173). Plaintiff informed Dr. Lynch she was medicating with Naprosyn, Ultram, and Tylenol (R. 174).

Dr. Lynch's physical examination revealed Plaintiff was alert, oriented, in no acute distress, and walked with a normal gait. He noted Plaintiff had no focal areas of tenderness or muscle spasms in her neck, but she had "some pain on end range of motion of her cervical spine but diffuse, nonspecific." Dr. Lynch's examination of Plaintiff's upper extremities revealed "some symptom magnification with arm movements but did display full active shoulder and elbow range of motion with encouragement." There were "no focal areas of tenderness . . . in the lateral medial epicondyle of the elbow or the subacromial regions of the shoulders." Plaintiff's shoulder, elbow, forearm, and wrist ranges of motion were normal. Dr. Lynch observed no muscle atrophy in her upper extremities, normal distal pulses, and no focal areas of tenderness in the upper extremities. Plaintiff's strength in her upper extremities was "5/5 proximally and distally." Plaintiff's sensation was intact in all dermatomes (R. 174).

Dr. Lynch's impression was for "[m]yofascial pain right arm and beginning in her left arm with some recent complaints of neck pain." He opined Plaintiff's symptoms were not related to carpal tunnel syndrome and did not recommend a left carpal tunnel release (R. 174). Because Plaintiff's symptoms "appear[ed] primarily to be myofascial in nature," but did not improve with physical therapy and medical treatment, Dr. Lynch ordered a cervical MRI (R. 174-75).

On September 22, 2001, Plaintiff underwent a MRI of her cervical spine. Steven Barnett, M.D., interpreted the MRI and opined it was normal (R. 176).

On October 3, 2001, Plaintiff presented to Dr. Pavlovich for follow-up examination of her

right carpal tunnel release surgery. Plaintiff stated she continued "to have burning pain from her right arm into her neck as well as into her left biceps area." Dr. Pavlovich observed no radicular symptoms associated with range of motion of her cervical spine, "5/5" motor strength, positive Tinel's test over the ulnar nerve at her elbow and median nerve at her wrist, positive Phalen's test bilaterally, normal sensory upper extremity, pain on passive range of motion of her shoulder, and positive impingement of both shoulders. Dr. Pavlovich recommended Plaintiff seek a second opinion with Gregg M. O'Malley, M.D. He opined Plaintiff's pain was not "well enough" for her to return to her previous occupation (R. 273).

On October 4, 2001, Dr. Lynch corresponded with West Virginia Workers' Compensation Fund. In that letter, he wrote Plaintiff had reached a maximum degree of medical improvement and had "a zero percent whole person impairment" (R. 194).

On November 28, 2001, Plaintiff was examined by Dr. Pavlovich, who opined she did not have any radicular symptoms with range of motion of her cervical spine or pain on passive range of motion of her shoulder. Dr. Pavlovich observed Plaintiff's Tinel's test over her median nerve was negative and her grip strength was "5/5." Dr. Pavlovich again recommended Plaintiff seek a second opinion with Dr. O'Malley (R. 272).

On January 13, 2002, Plaintiff reported to Dr. Pavlovich she had attempted to work for three hours per day, but had been unable to work "for the past ten days because of pain." Plaintiff had no radicular symptoms associated with range of motion of her cervical spine, neck pain, negative impingement of both shoulders, "5/5" grip and interossei strength, no pain on "CMC grind testing," and a "negative Watson maneuver." Dr. Pavlovich opined Plaintiff had a normal neurovascular examination. He assessed cervical strain and status post carpal tunnel release and noted Plaintiff was

unable to return to work (R. 271).

On January 17, 2002, Dr. O'Malley corresponded with Dr. Pavlovich relative to his consultative examination of Plaintiff on the same date. Dr. O'Malley noted Plaintiff informed him she did not improve after she had the carpal tunnel release surgery but "she did not get any worse." Dr. O'Malley wrote Plaintiff complained of numbness, tingling, and paresthesias in the median nerve distribution and pain up her arm into her shoulder and sometimes her neck. Dr. O'Malley observed, upon examination, "no sign of palmer cutaneous nerve problems"; "minimally positive Tinel's test in the cubital tunnel area on the right," but "really nothing to suggest cubital tunnel syndrome"; no thenar atrophy; good thenar muscle strength; normal Allen's test; negative test for pronator's syndrome; full range of motion of her shoulder; negative Adson's test; and an equivocally positive Wright's maneuver (R. 240). Dr. O'Malley's impression was Plaintiff "seem[ed] to have persistent median neuropathy." Dr. O'Malley recommended a diagnostic carpal tunnel injection as a possible "curative" and a repeat carpal tunnel release (R. 241).

On January 23, 2002, Plaintiff returned to Dr. Pavlovich with complaints of burning in her upper extremities, which radiated to her fingers and forearm. Dr. Pavlovich's examination of Plaintiff revealed no radicular symptoms associated with cervical spine range of motion, mildly positive Tinel's test over the median nerve, mildly positive Phalen's test, grip strength of "5/5," interossei strength "5/5," no atrophy of thenar or hypothenar eminence, and a well-healed incision. Dr. Pavlovich's impression was for volar wrist pain with possible recurrent carpal tunnel syndrome, which he treated with a Cortisone injection (R. 270).

On February 26, 2002, Plaintiff presented to Dr. Pavlovich with continued numbness and tingling into her fingers. Plaintiff informed Dr. Pavlovich she had "not seen significant

improvement" from the Cortisone injection of January 23, 2002. Dr. Pavlovich observed no changes in her clinical examination. His assessment was for thoracic outlet syndrome as well as carpal tunnel syndrome. He referred Plaintiff to physical therapy for her thoracic outlet syndrome (R. 269).

On March 12, 2002, Plaintiff returned to Elkins Physical Therapy Service for physical therapy (R. 247). Plaintiff received physical therapy on March 14, 18, 21, and 26, 2002 (R. 244).

On March 26, 2002, Plaintiff reported to Dr. Pavlovich she experienced nocturnal symptoms in each hand and in her fingers. Plaintiff stated she had no weakness in grip and had used splints, which did not significantly relieve her symptoms. Dr. Pavlovich's examination revealed no radicular symptoms associated with cervical spine range of motion, mildly positive elbow flexion test, positive Tinel's test over her median nerve at her wrist and ulnar nerve at her elbow, and a normal sensory exam distally. Dr. Pavlovich assessed cubital tunnel and carpal tunnel syndrome bilaterally. Dr. Pavlovich recommended continued physical therapy. He informed Plaintiff that a "significant amount of her symptoms being related to her pregnancy and then once her pregnancy [was] over her symptoms may improve." Dr. Pavlovich opined Plaintiff could not return to work for three months and recommended job retraining (R. 268).

Plaintiff received physical therapy at Elkins Physical Therapy Service on March 28, 2002; and April 2, 4, 9, 11, 17, 23, 24, and 26, 2002 (R. 243-44). Plaintiff did not attend a scheduled physical therapy session on April 19, 2002 (R. 243). On April 26, 2002, David Lee, Physical Therapist, opined Plaintiff had realized no significant change in her symptoms (R. 242).

On July 10, 2002, Plaintiff returned to Dr. Pavlovich with complaints of occasional numbness and tingling in her fingers and burning and frequent numbness in her hand. Dr. Pavlovich

opined Plaintiff had no radicular symptoms associated with her cervical spine range of motion; positive Tinel's test over her radial, median, and ulnar nerve; "5/5" grip strength; "5/5" interossei strength; and no atrophy of her thenar or hypothenar eminence. His assessment was for nerve hypersensitivity. Plaintiff was instructed to take anti-inflammatory drugs for her pain (R. 267).

On August 14, 2002, Plaintiff presented to Dr. Pavlovich with no radicular symptoms associated with her cervical spine range of motion, negative impingement of her shoulder, and hypersensitivity over her medial and radial nerves at her wrist and ulnar nerve at her elbow. Dr. Pavlovich's assessment was for hypersensitivity of multiple peripheral nerves. Dr. Pavlovich noted Plaintiff could not medicate with anti-inflammatory drugs as she was breast feeding and Plaintiff understood her pregnancy "may have caused irritation of these nerves" (R. 266).

On October 16, 2002, Plaintiff returned to Dr. Pavlovich with pain in her right upper extremity. He observed Plaintiff had a positive Tinel's test over her median nerve over the volar aspect and radial side of her wrist. He assessed hypersensitivity involving multiple cutaneous nerves. Dr. Pavlovich noted Plaintiff could not attend physical therapy as she lacked transportation and could not take anti-inflammatory drugs because she was breast-feeding (R. 265, 384).

On January 8, 2003, Kip Beard, M.D., completed an Independent Medical Examination of Plaintiff for the West Virginia Disability Determination Service. He filed his report on January 12, 2003. Plaintiff's chief complaints were for carpal tunnel syndrome, irritable bowel syndrome, and headaches. Plaintiff stated her symptoms for carpal tunnel syndrome included the following: tingling; numbness; feelings of pins and needles which involved her whole hand and radiated up her right arm into her neck; shooting pains from her palm to forearm; intermittent cramping in her right hand; and tenderness. Plaintiff informed Dr. Beard her symptoms made it difficult for her to peel

potatoes or drive a car (R. 354). Plaintiff's symptoms for irritable bowel syndrome included the following: frequent and daily cramping of her abdomen; "a lot" of diarrhea, at least a "few episodes . . . per month"; and abdominal tenderness (R. 354-55). Plaintiff informed Dr. Beard she did not experience hematemesis, melena, or hematochezia and had never been hospitalized for this condition. Plaintiff's symptoms for headaches were temple pain, which occurred five times per month and lasted for "a couple hours." Plaintiff informed Dr. Beard that Tylenol did not alleviate the pain, she had never undergone a brain MRI, she had reported to the emergency room "maybe two times because of headaches," and she had never seen a neurologist for headaches (R. 355)

Dr. Beard's general physical examination of Plaintiff revealed she ambulated with a normal gait, stood without assistance, had no difficulty rising from a seat, had no difficulty stepping up to or down from an examination table, was comfortable when seated, and was uncomfortable when in supine position. Plaintiff's head, eyes, ears, neck, throat, chest, cardiovascular, abdominal, and extremity examinations were normal. Dr. Beard observed Plaintiff experienced pain on her cervical spine range of motion testing and paravertebral tenderness. There was no spasm and Plaintiff's cervical spine range of motion for flexion, extension, lateral bending, and her rotation appeared normal (R. 355). Examination of Plaintiff's arms revealed "neck and shoulder girdle and shoulder blade pain with shoulder range of motion testing, but normal range of motion at the shoulders, elbows and wrists without tenderness, redness, warmth or swelling." Plaintiff's hands revealed a "well-healed right carpal tunnel release scar which [was] tender to palpation." There was no redness, warmth, swelling, atrophy, Heberden nodes, or Bouchard's nodes noted. Plaintiff was able to make a fist, write, and pick up coins without difficulty. Plaintiff demonstrated fifteen pounds of grip on the right and twenty pounds of grip on the left. Dr. Beard's examinations of Plaintiff's knees,

ankles, and feet were normal. The following LS spine and hips examination results were observed by Dr. Beard: normal curvature; pain on range of motion; paravertebral tenderness; no spasm; normal motion; ability to stand on either leg; straight leg-raising test was normal to ninety degrees bilaterally in the supine and sitting positions; normal forward bending at the waist; normal extension and lateral motion of the spine; no tenderness on palpation of hips; and flexion of hips normal bilaterally. Plaintiff's neurological examination revealed Tinel's sign at the right wrist, which produced tingling on the top of her hand; non-specific sensory discrepancies of her right hand; no focal weakness; no atrophies; equal mid-biceps and mid-forearm measurements; ability to heel walk, heel-to-toe walk, and squat (R. 357).

Dr. Beard's impression was for right carpal tunnel syndrome status post right carpal tunnel release; irritable bowel syndrome; and chronic headaches, not likely migraine but possible tension-type headaches (R. 357).

On January 22, 2003, Thomas Lauderman, D.O., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He opined Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 356). Dr. Lauderman found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 377-79).

Plaintiff first alleged depression in her Reconsideration Disability Report dated February 14, 2003 (R. 136). Where asked to describe any mental limitations she had as a result of her condition since she filed her claim, Plaintiff stated she was "depressed because [she was] unable to work and buy the things [she and her baby] needed." In response, SSA employee Sheila Heston reviewed the

17

record and found no record of any treatment for depression; no record of any medication for depression; and no observation of abnormal behavior noted by the SSA interviewer at the District Office (R. 140). According to the record, Ms. Heston contacted Plaintiff, who indicated she had had no hospitalization or counseling for any psychiatric problems. Plaintiff indicated to Ms. Heston that she did not believe counseling would be necessary.

On February 28, 2003, Fulvio R. Franyutti, M.D., a state-agency physician, reviewed Plaintiff's record and affirmed Dr. Lauderman's January 22, 2003, assessment of Plaintiff (R. 382).

On March 7, 2003, Samuel Goots, Ph.D., completed a Psychiatric Review Technique of Plaintiff, finding she had no medically determinable mental impairment (R. 360).

On May 9, 2003, Plaintiff presented to Women's Healthcare at Davis Memorial Hospital (R. 400). She had been brought there by an employee of the Women's Shelter. Plaintiff reported having been choked by her boyfriend on May 7, 2003. Bruising around her neck was observed. Plaintiff was approximately four months pregnant, and this was her first OB/GYN visit. She stated there was a possibility she sustained an abdominal injury during the choking incident. It was determined there was no injury to the fetus and no abnormalities.

A notation by Women's Healthcare dated July 9, 2003, indicates simply: "Severe depression. Referred to [illegible]" (R. 399). There is no subsequent evidence Plaintiff ever saw anyone for depression.

On July 10, 2003, Plaintiff presented to Dr. Pavlovich with complaints of burning in her hands, with radiation from her shoulders into her fingers. Plaintiff informed Dr. Pavlovich she used wrist splints, but realized no relief of her symptoms. Plaintiff stated she was pregnant and "believe[d] that her pain ha[d] worsened since becoming pregnant." Dr. Pavlovich observed no

radicular symptoms associated with Plaintiff's cervical spine range of motion testing. She had a positive Adson maneuver of both shoulders, which was consistent with thoracic outlet syndrome. Dr. Pavlovich also observed a positive Tinel's test over Plaintiff's median nerve bilaterally at her wrist and a positive Phalen's test with a mildly positive Tinel's test over her ulnar nerve at her elbow. Dr. Pavlovich assessed nerve hypersensitivity. He opined: 1) Plaintiff was unable to work "currently because of her persistent symptoms in her upper extremities bilaterally;" and 2) her condition had worsened due to pregnancy (R. 422). Plaintiff did not mention any depression.

At the January 5, 2004, administrative hearing, Plaintiff stated her conditions included carpal tunnel syndrome, bursitis, headaches, depression, pain in arms, pain in shoulders, pain in neck, pain in hands, pain in back, and irritable bowel (R. 456, 472, 473, 481). She stated she had not been taking medication for "at least a year" due to being pregnant and then nursing her baby (R. 456).

Plaintiff testified she lived with her 1½ year old and 2 month old children and her fifteen year old sister, of whom she had custody. Plaintiff stated the father of her two children did not live with her as he was incarcerated, having been charged with "attempted murder on a police officer" (458, 468-69). He had not yet been tried. She visited him once a week at the jail.

Plaintiff testified she maintained her own personal hygiene and grooming, except for applying make up and shaving her legs (R. 456-57). She stated she experienced difficulty sleeping two times per week due to irritable bowel syndrome. She "tr[ied] to take a, like half-hour nap with [her] kids" in the daytime (R. 459-60). She cooked breakfast, lunch, and dinner for her family. Her sister assisted in the preparation of dinner (R. 460). She washed dishes and did laundry, but her sister vacuumed, made beds, and changed linens (R. 461). She drove a car two or three times per week to shop, attend doctor's appointments, or visit the father of her children at jail (R. 462, 469,

70). She watched television for five to six hours daily and visited with friends twice per week (R. 463, 464). She wrote checks and balanced her checking account (R. 465). She no longer played basketball because she experienced shoulder pain, she did not swim because she could not afford the cost of admission to a swimming pool, and she did not exercise except for "chasing after the kids" (R. 467). Plaintiff testified she did not perform any home or yard maintenance (R. 471).

Plaintiff testified she had been prescribed Zoloft by Dr. Rosenblum "three or four years ago," but had never been in counseling for her depression (R. 472-73). She was not currently taking any antidepressants and was not seeing anyone about her depression.

Plaintiff stated her low back pain was exacerbated by sitting and standing too long, squatting, and trying to pick up an object, and she treated this condition with applications of a heating pad and taking Tylenol. Plaintiff stated she had been treated for back pain by Dr. Pavlovich and Dr. DeCourten, but was now being treated by Dr. Cormier, her gynecologist (R. 474). Plaintiff stated she treated the pain in her hands, arms, and neck with applications of a heating pad and massages (R. 475). Plaintiff testified she had not worn arm splints for two years (R. 476). Plaintiff stated she could sit for one hour before she had to stand and walk, stand for fifteen minutes before her back "bother[ed]" her, and walk for "[m]aybe a half-hour" (R. 477). Plaintiff testified it was easier for her to walk and sit than it was for her to stand. Plaintiff stated she could lift "maybe 25" pounds, could write, could hold coins, and hold a cup or glass (R. 478-79). Plaintiff testified she had no difficulty "getting along with other people" (R. 479). Plaintiff stated she could pick up an article from the floor, could reach overhead with her left hand/arm, and could reach overhead with her right hand/arm, but with pain (R. 479-80). Plaintiff testified the pain in her hands, arms, elbows, neck, and shoulders had gotten worse since July, 2004, in that she experienced frequent sharp pain and loss

of strength (R. 480-81). Plaintiff stated she had not done strengthening exercises for one year (R. 481). Plaintiff testified her irritable bowel syndrome caused constipation and then diarrhea for at least once a week and cramping in her stomach. Plaintiff stated she treated this condition by restricting her diet to avoid spicy, salty, sugared foods, taking "Pepto," and applying pressure to her stomach (R. 482, 484).

The ALJ entered her decision on February 4, 2004 (R. 27).

**Evidence Submitted to the Appeals Counsel**

Evidence Plaintiff submitted to the Appeals Council subsequent to the ALJ's decision of February 4, 2004, indicates Plaintiff began counseling for depression and anxiety in May 2004 (R. 437).

In June 2004, Plaintiff underwent a Mental Status Examination performed by Thomas Stein, Ed.D. (R. 436). Plaintiff told Dr. Stein she had severe depression (R. 437). She indicated she had had it most of her life, but it had been more severe since her boyfriend was sent to jail "and would be there fore quite while" [sic]. She also reported she had been raped at eight years of age and sexually molested at age 12, and currently experienced intrusive thoughts regarding these events.

Plaintiff told Dr. Stein she had been seeing a counselor once a week for her depression and anxiety for the past month, but was not taking any medications for any mental impairment (R. 438). She had not taken psychoactive medications in the past.

Upon mental status examination Dr. Stein found Plaintiff was casually dressed, neat, and clean with adequate posture and gait (R. 438). She was cooperative, polite, and appeared anxious. She maintained good eye contact and evidenced good length and depth of verbal responses. Although she displayed no sense of humor and appeared introverted, she did have good

21

conversational skills and generated a little spontaneous conversation. Her speech was relevant, coherent, and normal paced. Her mood was depressed and anxious. Her affect was anxious. She was fully oriented. There were no thought-processing disturbances, and no delusions, preoccupations, hallucinations, illusions, obsessions or phobias noted.

Objectively, Dr. Stein found Plaintiff cooperative, polite, anxious, and depressed, with average concentration, average judgment, and average memory, insight and intelligence (R. 439).

Plaintiff denied having any known allergies.

Dr. Stein described Plaintiff's daily activities as follows:

The claimant arises at 9:30, takes care of her personal hygiene, wakes up her children, feeds them, watches some cartoons with them, and then watches her soap operas. Then she showers and dresses, fixes and eats lunch with her children. After doing the dishes she goes to the store, returns home, watches television, fixes dinner, and eats with her children at 7. She cleans the kitchen, bathes her children, puts them [to] bed, and watches television until she goes to bed at midnight.

She handles her personal hygiene without assistance. She regularly cooks, washes dishes, and laundry. She cleans, but only sweeps and does not vacuum. She does not do yard work or gardening or automobile mechanic work. She grocery shops, runs errands, and drives. She walks short distances and occasionally sits on the porch. She collects hummingbird figurines.

(R. 440). Dr. Stein described Plaintiff's social functioning as follows:

She is cooperative and polite. She does not attend church nor is she dating. She does not hold membership in clubs or go to any meetings. She denies going to restaurants. She occasionally visits with friends and relatives and occasionally socializes with neighbors. She is presently mildly deficient in the social functioning area.

(R. 440).

Dr. Stein diagnosed Major Depression, recurrent type, without psychosis (R. 440).

Dr. Stein opined Plaintiff was mildly deficient in social functioning, and her concentration, persistence and pace were all within normal limits (R. 440).

22

On July 16, 2004, Plaintiff underwent allergy testing which indicated severe allergies to certain grasses and weeds (R. 442).

On July 22, 2004, Plaintiff's treating orthopedist, Dr. Pavlovich, indicated that Plaintiff would be disabled for six months – from that date until January 31, 2005 (R. 443). He did not include any explanation or basis for this determination.

In an undated letter to the Appeals Council, Plaintiff wrote asking for reconsideration of her claim (R. 444). She stated that her arm pain was not getting any better , she had just found out she had allergies to grass, and had been to counseling for her depression. She also indicated she was still having symptoms of irritable bowel syndrome once a week, lasting several days at a time, and that her treating physician had stated she was disabled. She stated that her check from DHHR had been lowered from $512.00 to $340.00 per month, and she had two little boys to care for with no help from any family or friends since her 15-year-old sister had left.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ Gibbs made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of the decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's right carpal tunnel syndrome is considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No 4 (20 CFR Part 404).

5. The undersigned finds the claimant's allegations regarding her limitations are not

23

totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the residual functional capacity to perform a range of light work with a sit/stand option. She may engage in postural activities on an occasional basis. She should not be required to perform gripping motions with her right hand more than occasionally, and she should not be required to perform overhead work or engage in repetitive motion with the right upper extremity.

7.      The claimant's past relevant work as a customer service representative did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.      The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work.

9.      The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9. [sic] The claimant has a "high school equivalent education" (20 CFR §§ 404.1564 and 416.964).

10.     The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR §§ 404.1586 and 416.968).

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.22 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a general office clerk, 156/148,051; mail clerk 39/51,382; interviewer, 106/68,146.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(R. 26-27).

## IV.  Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

24

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Defendant contends:

1)      Plaintiff is not disabled because she is unable to show that she meets the Act's strict durational requirement.

2)      Plaintiff has not alleged that remand is warranted under 42 U.S.C. § 405(g) and, therefore, this issue is waived.

### C. The ALJ's Decision

Under the regulations, an ALJ must consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether she retains the capacity to

perform specific jobs that exist in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of production and proof during the first four steps of the inquiry. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992) (per curiam). If the claimant can carry her burden through the fourth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant can perform despite her condition. See id.

The ALJ here first found Plaintiff had not engaged in substantial gainful activity since her alleged onset date. This finding is not disputed and is supported by the substantial evidence in the record.

20 C.F.R. §§ 404.1508 and 416.908 provide the definition of a medically determinable impairment as follows:

> Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms . . .

At the second step of the sequential analysis the ALJ found Plaintiff had the medically determinable impairments of bilateral carpal tunnel syndrome and irritable bowel syndrome. The ALJ also found Plaintiff's alleged back and neck pain and depression were not medically determinable impairments. The undersigned finds these findings are also supported by substantial evidence. Plaintiff's bilateral carpal tunnel syndrome was diagnosed through electromyogram. A colonoscopy indicated no mucosal abnormalities, no diverticula, no polyps, and no growth, but a physician stated the results "could be consistent with" spastic colitis or irritable bowel syndrome. Although Plaintiff complained of back and neck pain an MRI was normal and Plaintiff's range of motion of the spine

was generally normal, albeit at times with pain. There is no medical evidence to establish a back or neck impairment. Finally, there was also no medical evidence of depression at the time of the ALJ's decision.

The substantial evidence therefore supports the ALJ's determination that Plaintiff had the medically determinable impairments of bilateral carpal tunnel syndrome and irritable bowel syndrome, but not back pain, neck pain or depression.

The ALJ must next determine whether any of Plaintiff' medically determinable impairments is "severe." At step two of the sequential evaluation, Plaintiff bears the burden of production and proof that she had a severe impairment. <u>Grant v. Schweiker</u>, 699 F.2d 189, 191 (4th Cir. 1983). To be "severe," an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b), 416.921(b). The ALJ here found Plaintiff's right carpal tunnel syndrome was a severe impairment. She also found Plaintiff's left carpal tunnel syndrome and irritable bowel syndrome were non-severe impairments; however, because she found Plaintiff had a severe impairment, the Regulations required the ALJ to also consider those medically determinable non-severe impairments in the remaining steps of the sequential analysis. 20 C.F.R. §§ 404.1523 and 416.923.

At the third step of the sequential evaluation, the ALJ found that Plaintiff's right carpal

tunnel syndrome, although severe, was not severe enough singly or in combination with her other medically determinable impairments to meet or equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found Plaintiff's carpal tunnel syndrome was not attended by the clinical findings to satisfy the requirements of any of the impairments listed in Section 1.00, dealing with musculoskeletal system, or 11.00, dealing with the neurological system. A review of Listings 1.01 through 1.08 substantially supports the ALJ's determination that Plaintiff's carpal tunnel syndrome did not meet or equal any of the musculoskeletal listings. Likewise a review of 11.00 substantially supports the ALJ's determination that Plaintiff's carpal tunnel syndrome did not meet or equal a neurological listing. As analyzed under 11.00C, 11.14 and 11.04B, there was no evidence that Plaintiff had significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station.

Substantial evidence therefore supports the ALJ's determination that none of Plaintiff's impairments, alone or in combination, met or equaled a Listing.

At the fourth step of the sequential evaluation, the ALJ determined that Plaintiff retained the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy. In doing so, the ALJ considered the objective medical evidence in the record, the medical opinions in the record, and Plaintiff's statements regarding her symptoms and limitations, as well as Plaintiff's age, education, and work experience.

The record indicates that on August 1, 2000, Plaintiff's onset date, Plaintiff presented to her family physician with complaints that her "arm [was] getting worse." Plaintiff underwent an EMG on September 20, 2000, that was "mildly abnormal." Plaintiff underwent right carpal tunnel release

surgery on December 4, 2000. By January 24, 2001, Plaintiff reported her right carpal tunnel symptoms had completely resolved, although she now complained of pain in her shoulder and elbow. On February 14, 2001, Plaintiff was deemed "fit for full duty." By May 2001, Plaintiff reported her neck and shoulder pain had improved. She had no radicular symptoms and negative impingement, and only mild pain on range of motion testing of her shoulder. Plaintiff's treating physician opined she had realized significant improvement. By June 2001, Plaintiff reported her pain had greatly improved. She had no radicular symptoms and all testing was negative. In August 2001, Plaintiff reported mild paresthesias in her hands and fingers, no neck pain, and no pain radiating down her arm. Upon examination she had no pronounced sensory motor deficits which would create significant functional deficits. She also had normal activities of daily living. By the end of August, Plaintiff was reporting only pain in the superior aspect of her shoulder and tingling in her fingers. All testing was still normal. An IME in September 2001 indicated only "some" "diffuse, nonspecific" pain on end of range of motion testing of the cervical spine. She displayed some symptom magnification, but had full range of motion with encouragement. There were no focal areas of tenderness and no muscle atrophy. All ranges of motion were normal, strength was full throughout, and sensation was intact throughout. An MRI was normal. Throughout the remainder of 2001, Plaintiff's strength and range of motion were normal, and she had negative Tinel's test and full grip strength bilaterally. She had no radicular symptoms.

Plaintiff's symptoms apparently flared up during her first pregnancy in 2002, but her treating physician stated only that she could not return to her previous work for only three months. He recommended job retraining, supporting a finding that he believed she could do other work.

An independent medical examination conducted in January 2003, was generally normal, with

the exception of pain on range of motion testing, positive Tinel's sign at the right writs and non-specific sensory discrepancies of the right hand.

Plaintiff next complained of burning in her hands with radiation from her shoulders into her fingers in July, 2003, when she was again pregnant. She reported the pain had become worse since she became pregnant. Her treating physician still observed no radicular symptoms, but she did have positive Tinel's and Phalen's tests and a positive Adson maneuver of both shoulders. Dr. Pavlovich assessed nerve hypersensitivity, opined her condition had worsened due to pregnancy, and opined she was unable to work "currently."

During this time, Plaintiff's daily activities included caring for her infant and toddler, making breakfast, lunch, and dinner for them, washing dishes, picking up after the children, vacuuming every two to three weeks, shopping every two weeks, doing laundry, and going to Wal-Mart with her sister once a week. She had visitors approximately twice weekly, phoned the children' grandmother once weekly, visited her once monthly, maintained her own checking account, and paid her own bills. She also visited her boyfriend, the children's father, in jail once a week. Although she testified she could no longer play basketball, she admitted she had stopped doing so when she "started having children." Although she testified she no longer went swimming, she admitted this was because she did not have the money for admission.

The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff retained the residual functional capacity to perform a range of light work with a sit-stand option; occasional postural activities; no more than occasional gripping with her right hand; and no overhead work or repetitive motion with her right arm.

The undersigned finds substantial evidence also supports the ALJ's determination that

Plaintiff could perform her past relevant work as a customer service representative or, in the alternative, other jobs existing in significant numbers in the national economy.

The undersigned therefore finds substantial evidence supports the ALJ's determination, based on the evidence in the record at the time, that Plaintiff was not under a disability at any time through the date of her decision.

### E. The Appeals Council Decision

As discussed above, Plaintiff submitted additional evidence to the Appeals Council after the ALJ's decision of February 4, 2004. The evidence consisted of a letter; a Mental Status Examination dated June 17, 2004; allergy testing dated July 21, 2004; and a statement from her treating physician dated July 22, 2004, stating that she was disabled for six months, until January 31, 2005.

Defendant first argues that Plaintiff "waived" any argument regarding the Appeals Council decision, because she failed to allege that remand was warranted under sentence six of 42 U.S.C. § 405(g). Sentence six, however, regards new evidence submitted to the Court, not new evidence submitted to the Appeals Council. Plaintiff has not submitted any new evidence to the Court.

Regarding any possible waiver of Plaintiff's right to argue regarding the Appeals Council decision, the undersigned notes Plaintiff is proceeding *pro se*, and that her "Complaint" consisted entirely of the following:

> I am asking for the court to grant my claim for disability insurance benefits Supplemental Security Income.

> I have been unable to work due to many health problems since August 2000.

When subsequently required by the Court to show cause why her claim should not be dismissed due to her failure to file a Motion for Summary Judgment, Plaintiff simply wrote:

> I believe may [sic] case should remain open, since I am unable to work, due to the

following conditions; scoliosis; lower back pain; ulnar neuritis and carpal tunnel syndrome; irritable bowel syndrome; frequent headaches and severe allergies to grass and weeds.

I was last employed until August 2000. I frequently missed work due to severe pain in my hands and arms, and was eventually terminated from that job. I attempted to return to work in December 2001, but was forced to leave the position after only a few weeks, due to a recurrence of severe pain.

Under the circumstances, the undersigned will not find Plaintiff waived any argument she may have regarding the Appeals Council.

In Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. Wilkins further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . . Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.

Id. at 96.

There is no dispute that the evidence is "new." It is neither duplicative or cumulative and did not exist at the time of the ALJ's decision. Defendant, however, argues the evidence does not relate to the period on or before the date of the ALJ's decision "because it post-dates the ALJ's decision and, therefore, does not relate to the relevant time period in this case." (Defendant's brief at 13). The undersigned agrees that the statement from Plaintiff's treating physician that she would be disabled from July 2004 until January 2005 is not relevant to the period on or before the date of the ALJ's decision in February 2004; however, the undersigned cannot determine with certainty whether the evidence of depression or severe allergies is relevant to the time at issue. The evidence was dated four to five months after the ALJ's decision. While possible, it is not probable that severe

allergies or depression appeared overnight. On the other hand, Plaintiff did not mention allergies

or respiratory problems as impairments prior to this letter. She expressly told Dr. Stein shortly

before the allergy testing, that she had no known allergies. Similarly, although Plaintiff did state as

of February 2003, that she was "depressed," the reason was because of lack of money. When asked,

she told a Social Security employee that counseling was not needed. Through the next year, Plaintiff

never sought any evaluation or treatment for any mental impairment despite having access to medical

care and the means to obtain it. She had not even mentioned any depression or mental problems to

her treating physicians.

Even assuming the allergy tests and mental status evaluation are relevant to the time at issue,

they would still have to be material – that is, there would have to be a reasonable possibility that the

evidence would have changed the outcome of the ALJ's decision. The undersigned finds the

evidence of Plaintiff's severe allergies to grass would not reasonably have changed the ALJ's

decision. Plaintiff's past relevant work as a customer service representative, as well as the "other

work" named by the VE (general office clerk, mail clerk, and interviewer) were all generally indoor

work entailing little or no exposure to the grasses to which Plaintiff was allergic. The undersigned

therefore finds the allergy testing not "material."

The other new evidence Plaintiff submitted to the Appeals Council is a Mental Status

Examination, performed by Thomas Stein, Ed.D., that she underwent in June 2004, four months after

the ALJ's decision denying disability (R. 436).

Plaintiff filed her applications in October 2002, alleging disability since August 2000, due

to carpal tunnel syndrome. The first mention of "depression" in the record is in Plaintiff's

Reconsideration Disability Report dated February 14, 2003 (R. 136). Where asked in the form to

describe any mental limitations she had as a result of her condition since she filed her claim, Plaintiff stated she was "depressed because [she was] unable to work and buy the things [she and her baby] needed." In response, SSA employee Sheila Heston reviewed the record and found no record of any treatment for depression; no record of any medication for depression; and no observation of abnormal behavior noted by the SSA interviewer at the District Office (R. 140). According to the record, Ms. Heston then contacted Plaintiff to ask about her depression. Plaintiff told Ms. Heston she had had no hospitalization or counseling for any psychiatric problems. Plaintiff also told Ms. Heston she did not believe counseling would be necessary.

On March 7, 2003, State agency reviewing psychologist Samuel Goots, Ph.D., completed a Psychiatric Review Technique of Plaintiff, finding she had no medically determinable mental impairment (R. 360).

On May 9, 2003, Plaintiff presented to Women's Healthcare at Davis Memorial Hospital (R. 400). She had been brought there by an employee of the Women's Shelter. Plaintiff reported having been choked by her abusive boyfriend on May 7, 2003. Bruising around her neck was observed. Plaintiff was approximately four months pregnant, and this was her first OB/GYN visit. She stated there was a possibility she sustained an abdominal injury during the choking incident. It was determined there was no injury to the fetus and no abnormalities.

A notation by Women's Healthcare dated July 9, 2003, indicates simply: "Severe depression. Referred to [illegible]" (R. 399). This is the first medical note of any mental impairment in the record. There is no evidence Plaintiff ever went for any treatment, evaluation, or counseling, or even mentioned depression to any provider or anyone else after that date, despite having access to and the means to obtain medical treatment.

The ALJ entered her decision on February 4, 2004, finding, among others, that Plaintiff did not have any medically determinable mental impairment (R. 27).

In June 2004, Plaintiff underwent a Mental Status Examination performed by Thomas Stein, Ed.D. (R. 436). Plaintiff told Dr. Stein she had severe depression (R. 437). She indicated she had had it most of her life, but it had been more severe since her boyfriend was sent to jail "and would be there for quite while" [sic]. She also reported she had been raped at eight years of age and sexually molested at age 12, and currently experienced intrusive thoughts regarding these events.

Plaintiff told Dr. Stein she had been seeing a counselor once a week for her depression and anxiety for the past month, but was not taking any medications for any mental impairment (R. 438). She had not taken psychoactive medications in the past.

Upon mental status examination Dr. Stein found Plaintiff was casually dressed, neat, and clean with adequate posture and gait (R. 438). She was cooperative, polite, and appeared anxious. She maintained good eye contact and evidenced good length and depth of verbal responses. Although she displayed no sense of humor and appeared introverted, she did have good conversational skills and generated a little spontaneous conversation. Her speech was relevant, coherent, and normal paced. Her mood was depressed and anxious. Her affect was anxious. She was fully oriented. There were no thought-processing disturbances, and no delusions, preoccupations, hallucinations, illusions, obsessions or phobias noted.

Objectively, Dr. Stein found Plaintiff cooperative, polite, anxious, and depressed, with average concentration, average judgment, and average memory, insight and intelligence (R. 439).

Dr. Stein described Plaintiff's daily activities as follows:

The claimant arises at 9:30, takes care of her personal hygiene, wakes up her children, feeds them, watches some cartoons with them, and then watches her soap

35

operas. Then she showers and dresses, fixes and eats lunch with her children. After doing the dishes she goes to the store, returns home, watches television, fixes dinner, and eats with her children at 7. She cleans the kitchen, bathes her children, puts them [to] bed, and watches television until she goes to bed at midnight.

She handles her personal hygiene without assistance. She regularly cooks, washes dishes, and laundry. She cleans, but only sweeps and does not vacuum. She does not do yard work or gardening or automobile mechanic work. She grocery shops, runs errands, and drives. She walks short distances and occasionally sits on the porch. She collects hummingbird figurines.

(R. 440). Dr. Stein described Plaintiff's social functioning as follows:

She is cooperative and polite. She does not attend church nor is she dating. She does not hold membership in clubs or go to any meetings. She denies going to restaurants. She occasionally visits with friends and relatives and occasionally socializes with neighbors. She is presently mildly deficient in the social functioning area.

(R. 440). Dr. Stein diagnosed Major Depression, recurrent type, without psychosis (R. 440).

Dr. Stein opined Plaintiff was mildly deficient in social functioning, and her concentration, persistence and pace were all within normal limits (R. 440).

In Plaintiff's letter to the Appeals Council accompanying this evidence, she stated she had been to counseling for her depression. She noted her check from DHHR had been lowered from $512.00 to $340.00 per month, and she had two little boys to care for with no help from any family or friends.

The issue is, whether this Mental Status Evaluation, in July 2004, would reasonably have changed the ALJ's determination in February 2004. The undersigned finds it would not. There is simply no evidence indicating Plaintiff suffered from depression, aside from a one-time notation at the time she was abused by her boyfriend and in a women's shelter while pregnant in May 2003. After that, she again never mentioned depression to any treating physician or seek any evaluation or treatment until months after the ALJ's decision.

Additionally, although he diagnosed depression, Dr. Stein also opined Plaintiff's social functioning was only mildly impaired, and her concentration, persistence, and pace, judgment, memory, insight, and intelligence were all within normal limits. He therefore found no functional limitations due to depression (although he did note she limited herself due to her alleged physical impairments). A mere diagnosis of a condition is not enough to prove disability. There must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986). In addition, Plaintiff's daily activities were even less restricted than she testified to at the hearing, if only because her sister was no longer living with her to help. Still, she was able to take care of her own needs and care for her two young children and her house. The fact that she was not dating is irrelevant since she was visiting the father of her children once a week, and the fact that a young mother of two very young children does not belong to clubs or organizations or go to restaurants is also not very probative of a mental impairment.

The undersigned notes that in her letter to the Court dated July 20, 2005, Plaintiff again failed to even mention any mental problem. She stated that she was "unable to work due to scoliosis; lower back pain; ulnar neuritis and carpal tunnel syndrome; irritable bowel syndrome; frequent headaches and severe allergies to grass and weeds."

For all the above reasons, the undersigned finds the mental status evaluation performed four months after the ALJ's decision would not reasonably have changed the ALJ's decision, and is therefore not "material."

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI . I accordingly recommend

Defendant's Motion for Summary Judgment be **GRANTED,** Plaintiff's Motion for Summary Judgment be **DENIED,** and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _26_ day of February, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

38